

NUMBER 13-09-00421-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ESTER SALINAS,                                    Appellant,

v.

PAT TOWNSEND AND NORBERTO SALINAS,               Appellees.

**On appeal from the 206th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

### Before Justices Garza, Benavides, and Wittig[1]
### Memorandum Opinion by Justice Garza

Appellant, Ester Salinas, was found liable for slandering appellees, the current and

former mayors of Mission, Texas.  Appellant challenges the judgment by six issues,

---

[1] Justice Linda Reyna Yañez was a member of the panel at the time this case was argued and submitted for decision.  However, Justice Yañez could not participate in deciding the case, *see* TEX. R. APP. P. 41.1, and retired Justice Don Wittig was assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the Texas Government Code.  *See* TEX. GOV'T CODE ANN. § 74.003 (Vernon Supp. 2004).

contending that:  (1) her speech was constitutionally protected; (2) her statements were not, as a matter of law, unambiguous defamatory statements of fact; (3) appellees did not prove mental anguish; (4) appellees did not prove that her statements were made with actual malice; (5) there was a fatal variance between the pleadings and the proof; and (6) the trial court erred in admitting certain evidence.  We affirm in part and reverse and render in part.

## I. BACKGROUND

Appellee Pat Townsend was mayor of the city of Mission, Texas from 1984 to 1992 and was its city manager from 1995 to 2001; appellee Norberto Salinas ("Salinas") is the city's current mayor.  Appellant is a self-described community activist representing the interests of residents affected by chemical contamination at the former Hayes-Sammons pesticide plant in Mission.[2]  According to appellant, she became concerned about chemical contamination in 1998, when her son alerted her to the presence in their neighborhood of "[m]en dressed in scientific biohazardous [sic] outfits with tanks on their backs and total protection on their faces and their bodies."  Appellant learned that these "men in white" were removing "toxic dirt" from various sites around Mission; she also discovered that the areas had been designated as "Superfund" sites by the Environmental Protection Agency ("EPA").[3]

---

[2] The contamination at the former Hayes-Sammons plant formed the basis of a lawsuit involving hundreds of plaintiffs and dozens of defendants.  *See In re Allied Chem. Corp.*, 287 S.W.3d 115, 119-20 (Tex. App.–Corpus Christi 2009, orig. proceeding); *In re Helena Chem. Co.*, 286 S.W.3d 492, 494 (Tex. App.–Corpus Christi 2009, orig. proceeding).  Appellant is one of the plaintiffs in the suit; appellees are not parties to that suit.

[3] The term "Superfund" refers to the Hazardous Substance Superfund set up by the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980.  *See* 26 U.S.C. § 9507, 42 U.S.C. §§ 9601-9628.  A "Superfund site" is a contaminated area for which cleanup and

Over the course of the next decade, appellant performed extensive research on the history of the Hayes-Sammons plant and the effects of chemical contamination on the area's land and its inhabitants.  She, along with a committee of other affected citizens, eventually learned that thousands of people living in the Mission area were suffering from various "abnormal" illnesses, that hundreds of the residents' children were stillborn, and that many other area children were born with birth defects.  As a result of her research and investigation, appellant developed a fervent belief that these health problems were caused by chemical contamination emanating from the Hayes-Sammons plant, and that city officials were negligent in failing to notify Mission residents prior to 1998 that their land was contaminated.  Appellant further believed that city officials, including both appellees, failed to adequately address the crisis because they did not arrange for the affected citizens to be relocated from the contaminated areas.

In 1999, appellant retained an attorney to represent her in potential litigation against Hayes-Sammons's successor entities and other suppliers that contributed chemicals to the sites in question.  Appellant entered into a "fee sharing agreement" with the attorney whereby she would purportedly earn a percentage of the attorney's fees resulting from the representation of any plaintiffs that appellant referred to him. Appellant later learned that this "fee sharing agreement" was unenforceable because it contravenes the ethical rules governing Texas attorneys.  *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 5.04(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Vernon Supp. 2010) (providing generally that "[a] lawyer or law firm shall not share or

---

remediation have been designated by the EPA as eligible to be financed by Superfund proceeds.

3

promise to share legal fees with a non-lawyer"). Nevertheless, according to appellant, she eventually received at least $30,000 in payments from the attorney; appellant characterized these payments as reimbursement for expenses she incurred in investigating and preparing the case against the chemical companies.

In 2000, appellant, at the advice of counsel, recommended that the city retain the services of Dr. Robert K. Simon, a toxicologist, to perform testing at the contaminated sites. The city acceded to the recommendation. However, Townsend, city manager at the time, was skeptical of Dr. Simon's work and received the city council's permission to hire a second toxicologist, Dr. K.C. Donnelly, to do additional testing. According to Townsend, appellant "wasn't happy" about the hiring of a second toxicologist. Townsend further testified that, to his knowledge, Dr. Simon "never delivered the results of the tests" that the city had paid him to perform.

Appellant's obvious frustration and anger at city officials led her to make the four statements that are the subjects of the underlying suit. The first of these statements was made at a Mission city council meeting on March 24, 2003. At this meeting, members of the public were invited to comment on the proposed appointment of Townsend to lead the Mission Economic Development Authority ("MEDA"). Appellant publicly made the following statement there:

> Let me say my family and friends are severely opposing the outrageous nomination of Mr. Pat Townsend as Interim CEO/President of this MEDA or any position in the City of Mission. The days of slavery and corruption and abuse in South Texas have finished. This man in the past has known of pollution and has known of contamination and has betrayed the citizens that he was supposed to have represented. He has acted with me and many people of the South side with negligence for the name of self-profit and personal political gratification. Many families in the Southwest side have

4

come to me to complain to me about the way the infrastructure has been. They went to him about sewage and water and one family came to me with a deed from 1930 how Shary Union Pacific stole the land way [sic], to Mr. Pat Townsend asking for his help and what did he do instead of helping the families he yelled, insulted, and suppressed the truth for the victims[. O]n many occasions he has treated us with negligence which is heartless and malice [sic] behavior. . . . Mr. Townsend dwelled on Shar[]yland, Cimarron and factories to further pollute Mission. He was instrumental in inflicting human sufferage [sic] and sever[e] property damage. He had little respect for human health in environmental damages of 3,000 citizens. He resigned his former position as City Manager due to high stress levels and the way he treated Dr. Simon or was it because of guilt. My recommendation is that you be fair and you deal with proper [sic] in the total development of our community and not insult us with this man who has caused so many additional health problems, property damage and emotional distress. I, my family and friends are in opposition to this man being recommended for this position.

The second statement was made by appellant at an August 25, 2005 city council

meeting[4]:

Good afternoon Mayor and Members of the Council and public. Ester Pena Salinas, we the people from the super fund areas demand justice, justice for all where is it[?] Congratulation[s] to Miss Flores and I wish the five hundred . . . babies who were born died [sic] also had that opportunity to live and breath[e] unfortunately five hundred . . . of our babies were lost and nobody seems to care and if they do care there is no justice. It's unfortunate what that is [sic] has taken decades for EPA and all entities to come in and say that they are going to see if there is any contaminations [sic] stop play[ing] games with our lives. We are the people from the super funds and it[']s time for[] relocation. You[] all paid an ex city [council] member a hundred and eighty-five thousand[] for him to resign[,] well we want to be relocated. You are paying for additional council where there is TL TML funds[,] why did you use those funds, why did you have to hire someone at two hundred dollars an hour[? S]ome of my people got a hundred and twelve dollars and you know what justice day will come and some of you will be judged for the way you have stolen and lied and killed[.] But yet you continue to act as if you are in denial and I know you are timing me sir.

---

[4] Salinas was present at the August 25, 2005 meeting, as were the other members of the Mission city council. Townsend was not present at this meeting.

The third statement forming the basis of the slander suit was made by appellant during an interview broadcast on local television in October of 2008. During that interview, appellant stated: "So, we have to go fight in Court because even the mayor in La Joya told me that Norberto Salinas went to talk to him to say that they were going to kill me."[5] Billy Leo, the mayor of La Joya, Texas, testified that he could not remember whether or not he made the statement attributed to him by appellant.

Fourth, and finally, Salinas alleged in his sixth amended plea in intervention that appellant "called him a drug dealer and said th[at] he is politically corrupt." The evidence related to this allegation included testimony by Jose Montes, a Mission resident. Montes testified that appellant, upon seeing Salinas's campaign poster on Montes's house, told Montes that Salinas was "a big rat." When Montes was asked at trial what he understood appellant to mean by those words, he stated that "a big rat is—well, I understand it's like a—somebody big and like—well, you know, control of something, you know. . . . Well, like somebody, you know—rat means like somebody stealing or something." There was no other evidence adduced as to the meaning of the words "big rat." Domingo De La Garza, another resident of Mission, testified that appellant once called Salinas a "drug dealer" at a grocery store in front of "six or seven" other people. According to De La Garza, appellant "told me loud enough for people to hear what she was telling me." De La Garza testified that he had heard appellant call Salinas a "drug Lord" or "drug dealer" in front of other people "about three or four times."[6]

---

[5] Though the television interview was conducted in Spanish, the parties stipulated to the accuracy of this English translation that appears in the record.

[6] The testimony of Montes and De La Garza was provided in Spanish and was translated into

6

Townsend sued appellant shortly after the first statement was made in 2003, and Salinas intervened in the suit as a plaintiff in 2005.[7] Both Townsend and Salinas alleged defamation and requested actual and exemplary damages. At trial, appellant testified that she did make the statements attributed to her at the city council meetings and on the television interview, but she denied that she ever called Salinas "corrupt" or a "drug dealer." After the parties rested,[8] the trial court found as a matter of law that the March 24, 2003 statement was defamatory per se as to Townsend and that the remaining three statements were defamatory per se as to Salinas.[9] Accordingly, the jury was not asked whether the statements were defamatory; rather, the only questions submitted to the jury were whether each statement was false and whether each statement was made with actual malice.[10] The jury was also asked whether appellant actually stated that "Norberto Salinas is a drug dealer and corrupt politician." The jury answered all

English by the court reporter. The original Spanish testimony does not appear in the record before this Court. No party objected to the translations of the pertinent parts of Montes's and De La Garza's testimony as set forth above.

[7] Salinas's original plea in intervention complained only of the statements made at the August 25, 2005 city council meeting. Subsequent amended pleas in intervention also complained of the statements made on the 2008 televised interview and the statements made to Montes and De La Garza.

[8] Appellant moved for a directed verdict at the close of appellees' case-in-chief and again at the close of all evidence. The trial court denied both motions.

[9] The trial court also concluded that the statements made at the March 24, 2003 city council meeting were potentially defamatory per quod as to Salinas, which would have entitled him to a jury question on whether the statement was in fact defamatory as to him. However, Salinas did not request such a question and no such question was included in the jury charge.

[10] In accordance with appellees' pleadings, which requested exemplary damages, the jury was also asked whether it found by clear and convincing evidence that appellant made the statements with "malice." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (Vernon Supp. 2010) (providing that exemplary damages may be only awarded if the plaintiff proves by clear and convincing evidence that the harm resulted from fraud, malice, or gross negligence). The jury concluded that all of the statements, other than that made during the televised interview, were made with malice. Nevertheless, both Townsend and Salinas waived their exemplary damages claims after the jury returned its verdict.

7

questions in the affirmative and awarded $10,000 in damages to Townsend and $30,000 in damages to Salinas. This appeal followed.[11]

## II. APPLICABLE LAW

A statement is defamatory if it tends to injure one's reputation, exposing one to public hatred, contempt, or ridicule, or financial injury, or to impeach any person's honesty, integrity, virtue, or reputation. *Montemayor v. Ortiz*, 208 S.W.3d 627, 651 (Tex. App.–Corpus Christi 2006, pet. denied); *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.–Dallas 2003, no pet.); *see* RESTATEMENT (SECOND) OF TORTS § 559 (1977) ("A communication is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."). Whether a statement is defamatory is initially a question of law for the trial court and depends on whether a person of ordinary intelligence[12] would perceive the entire statement as so affecting the reputation of the plaintiff. *See Carr v. Brasher*, 776 S.W.2d 567, 569-70 (Tex. 1989); *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987). In determining this question, the court must construe each

---

[11] Appellees have filed a motion asking this Court to impose $5,000 in sanctions on appellant. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 732 (Tex. 1997) ("Courts possess inherent power to discipline an attorney's behavior."). The motion alleges the following: "Through fraud on the Hidalgo County District Clerk, Appellant was able to obtain approval of a zero supersedeas bond" after judgment was entered against her; "[d]espite the clearly void nature" of the bond, appellees were "forced to challenge" the bond in the trial court; as part of this challenge, appellees sought to depose appellant and obtain documents from her; appellant refused to provide documents on the dates suggested by appellees' counsel; appellant was served with a notice to produce the documents on December 7, 2009; appellant filed an untimely motion to quash said notice; and appellant did not produce the documents or appear for her deposition until January 2010. Having fully considered appellees' motion and appellant's response thereto, we deny the motion for sanctions.

[12] A "person of ordinary intelligence" is one who "exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004).

8

statement as a whole, in light of surrounding circumstances. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *Musser*, 723 S.W.2d at 654-55. If the statement, seen in this light, has but one clear and obvious meaning, then no further inquiry is necessary. *Gray v. HEB Food Store No. 4*, 941 S.W.2d 327, 329 (Tex. App.–Corpus Christi 1997, writ denied). But when a publication is of ambiguous or doubtful import, the jury must determine its meaning. *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 155 (Tex. 2004); *Diaz v. Rankin*, 777 S.W.2d 496, 499 (Tex. App.–Corpus Christi 1989, no writ).

Slander is a defamatory statement orally communicated or published to a third party without legal justification or excuse. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995); *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 91 (Tex. App.–Corpus Christi 1992, writ dism'd w.o.j.). To recover for slander, a plaintiff must prove the following elements: (1) an oral defamatory statement; (2) falsity of the statement[13]; (3) reference in the statement to an ascertainable person; and (4) publication of the statement to someone other than the allegedly defamed person. *Reeves v. Western Co. of N. Am.*, 867 S.W.2d 385, 393 (Tex. App.–San Antonio 1993, writ denied). To be actionable, a statement must constitute or contain an assertion of an objectively verifiable fact. *Am. Broad. Cos., Inc. v. Gill*, 6 S.W.3d 19, 29 (Tex. App.–San Antonio 1999, pet. denied) (citing *Burch v. Coca-Cola Co.*, 119 F.3d 305, 325 (5th Cir. 1997)).

---

[13] Texas courts have differed on whether a private slander plaintiff must prove falsity as part of its prima facie case, or instead, whether truth of the statement is an affirmative defense available to the defendant. *Compare Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (stating that truth is an affirmative defense in such suits) *with Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467, 472 (Tex. App.–Dallas 1994, writ denied) (stating that private slander plaintiffs have the burden of proving that the statement is false). However, when a slander plaintiff is a public official or public figure, as here, the United States Constitution requires the plaintiff to establish falsity. *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967); *N.Y. Times v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Turner v. KTRK Television*, 38 S.W.3d 103, 116-18 (Tex. 2000).

9

"[A] plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Turner*, 38 S.W.3d at 115.

If the trial court finds that the statement is unambiguous and not reasonably capable of defamatory meaning, then summary judgment for the defendant is proper. *Wheeler v. New Times, Inc.*, 49 S.W.3d 471, 474 (Tex. App.–Dallas 2001, no pet.). Otherwise, the statement will be classified either as slander per se or slander per quod.[14] *Minyard Food Stores, Inc. v. Goodman*, 50 S.W.3d 131, 140 (Tex. App.–Fort Worth 2001), *rev'd on other grounds*, 80 S.W.3d 573 (Tex. 2002). For an oral statement to constitute slander per se, it must fall within one of four categories: (1) imputation of the commission of a crime; (2) imputation of a loathsome disease; (3) injury to a person's office, business, profession, or calling; or (4) imputation of sexual misconduct. *Id.* (citing *Gray*, 941 S.W.2d at 329; *Villasenor v. Villasenor*, 911 S.W.2d 411, 418 (Tex. App.–San Antonio 1995, no writ)). If a statement is slanderous per se, no independent proof of damage to the plaintiff's reputation or of mental anguish is required, as the slander itself gives rise to a presumption of general damages.[15] *Bentley v. Bunton*, 94 S.W.3d 561,

---

[14] "Per quod" is Latin for "whereby," BLACK'S LAW DICTIONARY 1141 (6th ed. 1990), and is defined as "requiring reference to additional facts." *Moore v. Waldrop*, 166 S.W.3d 380, 384 n.1 (Tex. App.–Waco 2005, no pet.). "Per se," on the other hand, is defined as "of, in, or by itself; standing alone." BLACK'S LAW DICTIONARY 1142.

[15] Compensatory damages in defamation cases are divided into two categories: general and special. *Peshak v. Greer*, 13 S.W.3d 421, 427 (Tex. App.–Corpus Christi 2000, no pet.). General damages are damages for injuries to character or reputation, injuries to feelings, mental anguish, and other like injuries incapable of monetary valuation, *Vista Chevrolet, Inc. v. Barron*, 698 S.W.2d 435, 441 (Tex. App.–Corpus Christi 1985, no writ), while special damages involve some form of pecuniary or economic loss. *See Hurlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987).

10

604 (Tex. 2003); *Mustang Athletic Corp. v. Monroe*, 137 S.W.3d 336, 339 (Tex. App.–Beaumont 2004, no pet.) (citing *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984) (op. on reh'g)).   If the statement is not slanderous per se, the plaintiff must plead and prove special damages—i.e., some form of pecuniary or economic loss—in order for the statement to be actionable as slander per quod.   *Kelly*, 832 S.W.2d at 94; *Stearns v. McManis*, 543 S.W.2d 659, 661-62 (Tex. Civ. App.–Houston [1st Dist.] 1976, writ dism'd); *see Minyard Food Stores*, 50 S.W.3d at 140.   Here, neither Townsend nor Salinas have alleged or requested special damages.   Moreover, appellees have not asserted that appellant's statements imputed disease or sexual misconduct, or injured their office, business, profession, or calling.   *See Minyard Food Stores, Inc.*, 50 S.W.3d at 140.   Accordingly, the statements at issue in this case are actionable only if they are properly classified as slanderous per se by virtue of having imputed the commission of a crime.   *See id.*

Finally, if suit is brought by a public figure or public official, as here, the plaintiff must prove by clear and convincing evidence that the defendant acted with "actual malice."[16]   *Turner*, 38 S.W.3d at 114 (citing *Bose Corp. v. Consumers Union*, 466 U.S. 485, 510-11 (1984)).   In the context of defamation, "actual malice" is a term of art distinct from traditional common-law malice and does not include ill will, spite, or evil motive. *Alaniz v. Hoyt*, 105 S.W.3d 330, 346 (Tex. App.–Corpus Christi 2003, no pet.) (citing *Hagler v. Proctor & Gamble Mfg. Co.*, 884 S.W.2d 771, 771 (Tex. 1994) (per curiam); *Wal-Mart Stores, Inc. v. Lane*, 31 S.W.3d 282, 291 (Tex. App.–Corpus Christi 2000, pet.

---

[16] Prior to trial, the parties stipulated that Townsend and Salinas were public figures at the time each allegedly slanderous statement was made, and that the statements involved public issues.

11

denied)). Instead, "'[a]ctual malice' requires proof that the defendant made the statement 'with knowledge that it was false or with reckless disregard of whether it was true or not.'" *Isaacks*, 146 S.W.3d at 162 (quoting *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000)).

## III. DISCUSSION

### A. Constitutional Protection

By her first issue, appellant argues that her statements are protected by the United States and Texas Constitutions. *See* U.S. CONST. amend. I; TEX. CONST. art. I, § 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege . . . ."). In support of this assertion, appellant points to the following oft-cited quotations derived from United States Supreme Court cases:

> [T]he Constitution protects "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" made in debate over public matters in order to "provide[] assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation[.]"

*Bentley*, 94 S.W.3d at 580 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

> "The fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas."

*Isaacks*, 146 S.W.3d at 154 (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 55-56 (1988)). These statements, however, simply reflect and expound upon the

12

well-established tenet of law that, in order for a statement to be considered capable of defamatory meaning, it must be, or imply, a false statement of objective fact. *See Gill*, 6 S.W.3d 19, 29; *see also Pisharodi v. Barrash*, 116 S.W.3d 858, 863 (Tex. App.–Corpus Christi 2003, pet. denied) (finding a statement accusing plaintiff of assault to be capable of defamatory meaning even though couched in terms of defendant's "professional opinion"). In *Milkovich*, the United States Supreme Court rejected the notion that the First Amendment provides independent protection for defamatory statements which are categorized as "opinion" as opposed to "fact." 497 U.S. at 17-22. Instead, the Court noted that expressions of "opinion" may often imply actionable assertions of objective fact. *Id.* at 18. For example,

> [i]f a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. . . . Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Id.* at 18-19.

Additionally, to the extent that appellant is arguing that her statements before the city council are privileged or entitled to a different level of scrutiny because they were made in the course of an official governmental proceeding, she is incorrect. While communications made in the due course of a judicial proceeding are privileged and may not serve as the basis of a defamation action, *see James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982), there is no similar privilege recognized for statements made in the context of legislative, executive, or administrative functions of government. Therefore, the mere fact that two of appellant's allegedly defamatory statements were made during official city

13

government proceedings does not shield her from liability.

Appellant's first issue is overruled.

## B.    Per Se Defamation and Actual Malice

By her second issue, appellant argues that the trial court erred by finding all four statements to be per se defamatory.   By her fourth issue, she contends that the evidence adduced at trial was legally and factually insufficient to establish that she made the statements at issue with actual malice.   We will consider these issues together as they apply to each of the allegedly defamatory statements.

As noted, the statements will be actionable only if they are deemed to be slanderous per se by virtue of having imputed to appellees the commission of a crime. *See Minyard Food Stores, Inc.*, 50 S.W.3d at 140 (listing categories of statements that are per se defamatory); *Kelly*, 832 S.W.2d at 94 (slander plaintiff must plead and prove special damages in order to recover for defamation per quod); *Mitre v. Brooks Fashion Stores, Inc.,* 840 S.W.2d 612, 619 (Tex. App.–Corpus Christi 1992, writ denied), *overruled on other grounds by Cain v. Hearst Corp.*, 878 S.W.2d 577, 578 (Tex. 1994) (noting that a statement that unambiguously and falsely imputes criminal conduct to plaintiff is defamatory per se).   However, the charge of violating a criminal statute need not be made in a technical manner such as might be required of an indictment.   *Mitre,* 840 S.W.2d at 620.   It is sufficient to constitute slander per se if, in hearing the statement, an ordinary person would draw a reasonable conclusion that the complaining party was being accused of violating some criminal law.   *Id.*

14

### 1.  Townsend

We first consider appellant's statement at the 2003 city council meeting, which the trial court found to be defamatory per se as to Townsend.  At that meeting, appellant stated that she was objecting to the appointment of Townsend to lead a local economic development commission.  In expressing her objection, appellant made a number of pointed criticisms that the trial court determined had implied that Townsend had engaged in criminal behavior.  These statements included the following:  "The days of slavery and corruption and abuse in South Texas have finished"; "[Townsend] has acted . . . with negligence for the name of self-profit and personal political gratification"; "Townsend dwelled on Shar[]yland, Cimarron and factories to further pollute Mission"; "[Townsend] was instrumental in inflicting human sufferage [sic] and sever[e] property damage"; and "[Townsend] has caused so many additional health problems, property damage and emotional distress."

Appellant argues that these statements constitute mere rhetorical hyperbole, which is not actionable.  *See Gill*, 6 S.W.3d at 30 ("'Rhetorical hyperbole' is 'extravagant exaggeration' 'employed for rhetorical effect.'").  She further contends that her words were constitutionally protected in part because of the forum in which they were uttered.  We have noted that the law recognizes no general privilege for remarks made in governmental proceedings.  However, we are required to evaluate the nature of a statement in light of all surrounding circumstances.  *Turner*, 38 S.W.3d at 114; *Musser*, 723 S.W.2d at 654-55.  Here, those circumstances include the fact that appellant was speaking in a public forum about an issue—and concerning a public official—with which

15

the audience was intimately familiar. Under such circumstances, even assuming that appellant's remarks unambiguously referred to Townsend and expressed objectively verifiable facts, we do not believe that a person of "ordinary intelligence" would have concluded from those words that Townsend was being accused of violating a criminal law. *See Mitre,* 840 S.W.2d at 620. That is, an ordinary person hearing appellant's remarks would not have understood them as meaning that Townsend actually engaged in slavery or theft; instead, such a person would have understood the remarks as harsh—and possibly unfounded—criticisms of Townsend's performance in his official roles as mayor and as city manager. In reaching this conclusion, we are cognizant of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Isaacks*, 146 S.W.3d at 154 (citing *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964)).

We are also mindful that certain public officials—particularly, those in policymaking positions such as mayor—are prone to receiving hyperbolic criticism precisely because of the power they wield and the often momentous consequences of their official decisions. For example, a citizen may accuse a legislator of being a "murderer" because that legislator supports the death penalty. There, the citizen is relying on an objective fact—that the legislator supports a policy that may lead to the deaths of individuals—but is embellishing that fact by ascribing personal responsibility to the legislator for any lives lost as a result of that policy. In any case, no reasonable person listening to the citizen's statement could believe that the legislator had just been accused of committing a crime.

16

Instead, an ordinary person would believe that the citizen merely disagreed with the legislator's policy choices and chose to express that disagreement in unusually stark terms. This analogy also holds for matters less weighty than the morality of capital punishment—for example, a citizen may call a county commissioner a "thief" because he or she advocates higher taxes; or, a citizen may call a judge a "crook" because of some perceived bias. In both cases, the citizen uses words that, under normal circumstances, imply the commission of a crime. But, given the public status of the individuals made the subject of those statements, no ordinary listener—i.e., no one that "exercises care and prudence," *Isaacks*, 146 S.W.3d at 157—would reasonably believe that the speaker was actually making accusations of criminal behavior. Without any further elaboration, such remarks instead reflect only the citizen's strong disagreement with the officials' lawful exercise of discretion in their role as public servants. *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (finding an accusation of "blackmail" not to be defamatory per se because, among other things, the plaintiff was a public figure, the subject matter was well-known, and the statement was made at a city council meeting).

Similarly, given Townsend's former status as mayor and city manager, and given the well-understood context surrounding the Hayes-Sammons affair, no ordinary listener would perceive appellant's remarks at the 2003 city council meeting as having charged Townsend with committing a crime. The only reasonable conclusion an ordinary listener could have drawn from those remarks is that appellant fiercely disapproved of how Townsend performed his official duties with regard to the chemical contamination at the Hayes-Sammons plant, and that she believed that his official decisions resulted in

17

property damage and serious public health problems. Whether or not appellant was justified in those beliefs is immaterial—our only concern is whether her remarks would be reasonably understood by an ordinary listener as having charged Townsend with criminal behavior. They would not.

We therefore conclude that the trial court erred in classifying appellant's 2003 statement as slanderous per se. Because Townsend neither pleaded nor proved special damages, the trial court's only available course of action was to dismiss Townsend's claims. *See Kelly*, 832 S.W.2d at 94; *Stearns*, 543 S.W.2d at 661-62. We sustain appellant's second issue as it relates to the 2003 statement.[17]

### 2. Salinas

We next consider the statements allegedly made by appellant that the trial court found to be defamatory per se as to Salinas. At the outset, we note that the jury charge included only a single broad-form damages question, question number eighteen, asking what amount of money would fairly and reasonable compensate Salinas "for the injury, if any, that resulted from the occurrence[s] in question." At the charge conference, appellant's counsel did not object to the submission of question number eighteen on the grounds that a broad-form submission of damages was improper and, instead, multiple, granulated damages questions should be submitted.[18] Therefore, we will sustain the

---

[17] Having concluded that appellant's March 24, 2003 statement was not defamatory per se, we need not address appellant's fourth issue, challenging the sufficiency of the evidence as to actual malice, as it relates to that statement. *See* TEX. R. APP. P. 47.1.

[18] Appellant's counsel did object to question number eighteen at the charge conference, but only on the following grounds:

> [Defense counsel]: As to question number eighteen, the Defendant, again, incorporates by reference the objections lodged as to questions fifteen [asking

18

damages award to Salinas if any of the three allegedly defamatory statements are legitimately actionable and supported by the evidence.  *See Wackenhut Corr. Corp. v. De La Rosa*, 305 S.W.3d 594, 619-21, n.26 (Tex. App.–Corpus Christi 2009, no pet.) (holding that, when a broad-form damages question allows the jury to base its award on both valid and invalid grounds, the award may not be disturbed on appeal if the defendant did not preserve an objection to the broad-form question on the basis that the jury may have based its award on an improper ground) (citing *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212 (Tex. 2005); *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003); *Harris County v. Smith*, 96 S.W.3d 230, 232 (Tex. 2002)).

First, we consider whether appellant's statements during the 2008 television interview were defamatory per se.  The entire statement, as submitted to the jury, is as

whether the 2008 television statement was false], sixteen [asking whether appellant acted with actual malice as to the 2008 television statement] and seventeen [asking whether the 2008 television statement proximately caused Salinas to suffer mental anguish] regarding the variance with the pleadings and the statement as printed in question fifteen and the lack of any evidence to support any issue regarding that statement, the failure of [Salinas] to plead [slander] per quod of the statement that—that could, at best, either be incapable of defamatory meaning or ambiguous and, likewise, there being no pleading for special damages, innuendo, or implication, there can be no entitlement to money damages in—in—and this being the case, this is improper.

In addition, there is no evidence or insufficient evidence of any injury suffered by Norberto Salinas as a proximate result of any matter at issue in this case that would rise to the level of an entitlement to money damages for mental anguish.

And this is regarding entitlement as it pertains to and as conditioned upon [answer]s of yes to questions number eight [asking whether the 2005 city council statement proximately caused Salinas to suffer mental anguish], thirteen [asking whether the statement that Salinas is a "drug dealer and a corrupt politician" proximately caused him to suffer mental anguish], or seventeen.

THE COURT:          Overruled.

19

follows: "[W]e have to go fight in Court because even the mayor in La Joya told me that Norberto Salinas went to talk to him to say that they were going to kill me." Salinas concedes in his appellate brief that these allegations "possessed the believability of an Elvis sighting; even in the Rio Grande Valley, political opponents are not executed." But we are not called upon to evaluate the objective credibility of allegedly defamatory statements; instead, our task is to determine whether a person of "ordinary intelligence" would have understood that Salinas was being accused of criminal behavior. In this instance, considering the surrounding circumstances, we conclude that an ordinary listener would have reasonably understood appellant's statement as accusing Salinas of plotting to have her killed, which is a criminal offense. *See* TEX. PENAL CODE ANN. §§ 15.02 (criminal conspiracy), 19.02 (murder) (Vernon 2003). We therefore find that the trial court did not err in determining that this statement constituted slander per se.

We next turn to the issue of actual malice. The United States Supreme Court has held that judges have a constitutional duty to "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity" in defamation suits brought by public officials. *Bose Corp.,* 466 U.S. at 514; *Clark v. Jenkins*, 248 S.W.3d 418, 435 (Tex. App.–Amarillo 2008, pet. denied). Because actual malice is required to be proved by clear and convincing evidence, we will find the evidence to be legally sufficient only if it is substantial enough such that the jury could reasonably form a firm belief or conviction that appellant acted with actual malice. *See Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (Vernon Supp. 2009). "If, in light of the entire record, the

20

disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

As noted, defamatory words are communicated with actual malice when the defendant knows the words are false or recklessly disregards whether the words are false or not. *Randall's Food Mkts.*, 891 S.W.2d at 646; *Hagler*, 884 S.W.2d at 772. "Reckless disregard" is a subjective standard, focusing on the defendant's state of mind. *Isaacks*, 146 S.W.3d at 162 (citing *Bentley*, 94 S.W.3d at 591). Mere negligence is not enough. *Id.* Rather, the plaintiff must establish that the defendant in fact entertained serious doubts as to the truth of his publication, or had a high degree of awareness of the probable falsity of the published information. *Id.* Although actual malice focuses on the defendant's subjective state of mind, a plaintiff can prove it through objective evidence about the circumstances surrounding the alleged defamatory words. *Alaniz*, 105 S.W.3d at 347 (citing *Turner*, 38 S.W.3d at 120). Actual malice also may be proved by circumstantial evidence of the defendant's state of mind. *Id.*

At trial, appellant was asked during direct examination about the circumstances regarding the statement allegedly made by Mayor Leo that led to appellant's remarks during the televised interview. Appellant explained:

> I went to a function where we were fund-raising to send a couple of younger kids, or in their 20's, to the national democratic convention. At that time, I sat with Mr. [a]nd Mrs. Leo and some other friends. . . . When I was talking to Mr. Leo, I said, well, how's Mr. Raymond doing? That's Ramon Garcia because they're good friends. He says, no, I haven't talked to Ramon, the one who's calling me is Norberto. And Norberto told me he was going to

21

kill you or he was going to have you killed. And I looked at Billy, like, what are you talking about? And he said, no, he said—he—he told me—he told me that. And I said, Mr. Billy, that's not funny. That's not—are you for serious [sic]? He said, no. You know he's a very powerful man.

Mayor Leo testified that, although he did not have any specific recollection of Salinas telling him that he was "going to kill" appellant, he believed that was something Salinas "might have said" given Salinas's anger toward appellant at the time he spoke to Mayor Leo. On cross-examination, Salinas's counsel inquired further as to the circumstances surrounding Mayor Leo's alleged statement:

Q. [Salinas's counsel] In October of 2008 after you heard this, what you told the jury was a very serious accusation that was being made by—purported statement that was being made by the mayor [of La Joya], did you call the police?

A. [Appellant] No, sir.

Q. You didn't report the fact that you'd gotten information from someone that someone was trying to kill you? You didn't—you didn't think that that was something you should have reported to the police?

A. No, sir, I didn't report it but I should have.

Appellant's admission that she did not call the police in response to Mayor Leo's alleged statement, in combination with Mayor Leo's failure to recall having made the statement, allowed the jury to reasonably form a firm belief or conviction that appellant harbored "serious doubts" as to whether Salinas actually planned to kill her. *See Isaacks*, 146 S.W.3d at 162. Accordingly, the evidence was legally and factually sufficient to establish that the appellant made the televised remarks with actual malice. *See Garza*, 164 S.W.3d at 627. Appellant's fourth issue is overruled as it relates to the

22

statements made during the 2008 televised interview.

In light of our conclusions that (1) the 2008 televised statement was defamatory per se as to Salinas, and (2) the evidence was sufficient to establish that appellant acted with actual malice in making that statement, we need not address appellant's second or fourth issues as they relate to (1) the statement made at the 2005 city council meeting, or (2) the statement that "Norberto Salinas is a drug dealer and corrupt politician."[19]   *See Wackenhut Corr. Corp.*, 305 S.W.3d at 619-21, n.26 (citing *Romero*, 166 S.W.3d at 212; *In re B.L.D.*, 113 S.W.3d at 350; *Harris County*, 96 S.W.3d at 232).   That is, because at least one of the grounds upon which the jury based its damage award was legally valid, and because appellant did not object to the broad-form damages question on the basis that more than one such question should have been submitted, we may not disturb the jury's award of $30,000 in damages to Salinas.   *See id.*

## C.      Sufficiency of Evidence of Mental Anguish

By her third issue, appellant contends that there was insufficient evidence shown that appellees suffered compensable mental anguish.   However, it is not necessary to

---

[19] We note that there was no evidence adduced at trial that appellant ever actually uttered the words "Norberto Salinas is a drug dealer and corrupt politician."   In fact, no witness testified that appellant ever used the words "corrupt politician" to describe Salinas.   Appellant's counsel objected at trial to the submission of jury charge question number ten, asking whether appellant "made" the statement that "Norberto Salinas is a drug dealer and corrupt politician," on this basis.   However, the trial court overruled the objection, and appellant does not challenge that ruling on appeal.   Accordingly, we may not consider the issue.   *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) ("[T]he courts of appeals may not reverse the judgment of a trial court for a reason not raised in a point of error.") (citing *Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex. 1990); *San Jacinto River Auth. v. Duke*, 783 S.W.2d 209, 210 (Tex. 1990)).

Question number ten was also arguably erroneous as a matter of law because it merely asked whether appellant "made" the statement and did not ask whether she published the statement to a third party.   *See, e.g., Reeves v. Western Co. of N. Am.*, 867 S.W.2d 385, 393 (Tex. App.–San Antonio 1993, writ denied) (reciting elements of slander).   However, appellant did not object to the question at trial on this basis, and she does not raise the issue on appeal, so we cannot reverse on this basis.   *See Walling*, 863 S.W.2d at 58.

23

prove mental anguish where the words used are slanderous per se, because the law presumes actual damages. *Kelly*, 832 S.W.2d at 91; *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 922 (Tex. App.–Corpus Christi 1991, writ dism'd w.o.j.). As noted, appellant's statements, if actionable, are actionable only as slander per se because neither appellee pleaded or proved special damages. *See Kelly*, 832 S.W.2d at 94; *Stearns*, 543 S.W.2d at 661-62. Accordingly, appellees were under no obligation to prove that they suffered compensable mental anguish. We overrule appellant's third issue.

## D.    Variance Between Pleadings and Proof

By her fifth issue, appellant claims the judgment must be reversed because there was a fatal variance between the pleadings and the evidence adduced at trial with respect to the 2008 television interview. Texas follows a "fair notice" standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). To be reversible, any variance between the pleadings and the proof "must be substantial, misleading, constitute surprise and be a prejudicial departure from the pleadings." *Fruehauf Corp. v. Ortega*, 687 S.W.2d 777, 782 (Tex. App.–Corpus Christi 1985, no writ).

In his sixth amended plea in intervention, Salinas alleged that:

[J]ust yesterday in a television interview [appellant] has stated that [Mayor] Salinas was going to kill her. She then contacted Mr. Billy Leo (Mayor of La Joya) also telling him that Mr. Norberto Salinas was going to kill her. These statements were made in front of many people.

Appellant argues that the evidence did not precisely establish that appellant told Mayor

24

Leo that Salinas was going to kill her. Instead, according to appellant, the evidence established that she stated during the interview that Mayor Leo *told her* that Salinas *told him* that Salinas was going to kill her. We disagree that this slight difference between the pleadings and the proof presented at trial was substantial or misleading. "[A] broad submission of an issue will [not] be reversed simply because one or more acts which contributed to the injury was not particularly pleaded or proved." *Fruehauf Corp.*, 687 S.W.2d at 782 (citing *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931 (Tex. 1980)). Further, a pleading is deemed sufficient "if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982). Here, the variance between appellant's statement as alleged in Salinas's pleadings and the statement as proved was not prejudicial, nor did it prevent appellant from preparing her defense. Her fifth issue is therefore overruled.

**E.    Evidence of Fee Sharing Agreement**

By her sixth issue, appellant argues that the trial court erred by admitting evidence of her "fee sharing agreement." Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A trial court abuses its discretion when it rules without reference to any guiding rules or principles. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998) (citing *City of Brownsville*, 897 S.W.2d at 753). If error is found, we will reverse only if: (1) the excluded evidence was controlling on a material issue; (2) the excluded evidence

was not cumulative of other evidence; and (3) the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. *See* TEX. R. APP. P. 44.1; *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000).

Appellant argues that the evidence of her "fee sharing agreement" was irrelevant to any issue properly before the jury and was "extremely prejudicial." Appellees contend that the evidence was relevant as to appellant's motive for making the allegedly defamatory statements. As noted, in the context of defamation, "actual malice" does not include ill will, spite, or evil motive. *Alaniz*, 105 S.W.3d at 346. However, ordinary "malice" was also an issue before the jury, because both appellees pleaded exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (providing that exemplary damages may be only awarded if the plaintiff proves by clear and convincing evidence that the harm resulted from fraud, malice, or gross negligence). It was not an abuse of discretion for the trial court to have found that the "fee sharing agreement" was relevant to the issue of ordinary malice. *See id.* § 41.001(7) (Vernon 2008) ("'Malice' means a specific intent by the defendant to cause substantial injury or harm to the claimant.").

Further, we cannot say that the trial court abused its discretion by concluding that the probative value of this evidence outweighed its prejudicial value. *See* TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."). Appellant's sixth issue is overruled.

26

## IV. CONCLUSION

We reverse the judgment of the trial court with respect to appellee Townsend and render judgment that Townsend take nothing by way of his suit against appellant. The remainder of the trial court's judgment is affirmed.

_____
DORI CONTRERAS GARZA
Justice

Delivered and filed the
6th day of January, 2011.