

# NUMBER 13-21-00303-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

DANTE FLORES-DEMARCHI,                                          Appellant,

v.

MELISSA SMITH AND JOSE GARCIA,                          Appellees.

On appeal from the 206th District Court
of Hidalgo County, Texas.



# NUMBER 13-21-00304-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JOHN DOE,                                                        Appellant,

v.

MELISSA SMITH AND JOSE GARCIA,                   Appellees.

## On appeal from the 206th District Court
## of Hidalgo County, Texas.

# MEMORANDUM OPINION

## Before Chief Justice Contreras and Justices Benavides and Marion[1]
## Memorandum Opinion by Chief Justice Contreras

Appellees Melissa Smith and Jose "Pepe" Garcia, current or former members of

the Sharyland Independent School District (Sharyland ISD) board of trustees, filed a

---

[1] The Honorable Sandee Bryan Marion, Senior Chief Justice (Retired) of the Fourth Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. §§ 74.003, 75.002, 75.003.

defamation suit against appellants Dante Flores-Demarchi and John Doe. Flores-Demarchi and Doe separately moved to dismiss the suit under the Texas Citizens Participation Act (TCPA). Appellees subsequently withdrew their claims against Doe, and both appellants' TCPA motions were denied by operation of law.

In appellate cause number 13-21-00303-CV, Flores-Demarchi argues: (1) appellees did not prove each element of their claims by clear and specific evidence; (2) appellees did not provide evidence negating his affirmative defenses; and (3) federal law preempts state tort liability in this case. In appellate cause number 13-21-00304-CV, Doe argues by one issue that the trial court erred by: (1) failing to grant his TCPA motion; (2) failing to award him attorney's fees; and (3) failing to rule on his request for sanctions.

Because appellees failed to produce clear and specific evidence of actual malice, we conclude the TCPA motions to dismiss should have been granted. We reverse and remand.

## I.  BACKGROUND

In their original petition filed on April 12, 2021, appellees alleged that Flores-Demarchi and Doe[2] published false and defamatory statements about them on Facebook. Appellees sought damages and injunctive relief. Flores-Demarchi answered the suit and raised various affirmative defenses, including immunity under § 230 of the federal Communications Decency Act. *See* 47 U.S.C.A. § 230.

Flores-Demarchi filed a "Motion to Dismiss Pursuant to the [TCPA]" on May 6, 2021, arguing that appellees cannot prove the essential elements of their claim and

---

[2] The petition also named "Jane Doe" as a defendant, and it stated that appellees "do not know the true names" of John Doe or Jane Doe and "will amend this Petition to allege the true names and identities when ascertained." However, subsequent amended petitions did not name either Doe as a defendant.

3

"cannot overcome" his affirmative defenses. The motion requested dismissal as well as attorney's fees and sanctions under the TCPA. At 5:04 p.m. on June 14, 2021, Doe filed a "Motion to Dismiss Pursuant to the [TCPA]" making largely the same arguments as Flores-Demarchi's motion to dismiss. Like Flores-Demarchi, Doe requested dismissal of appellees' suit as well as attorney's fees and sanctions under the TCPA. At 5:14 p.m. that same day, appellees filed an amended petition naming only Flores-Demarchi as a defendant, but otherwise retaining the same factual allegations as in their original petition.

On June 18, 2021, appellees filed a second amended petition listing twenty-three Facebook posts which they alleged were made by Flores-Demarchi between January 17, 2020, and May 1, 2021, several of which include material re-posted from a separate Facebook account called "Red's Voice," which was operated by Doe. Nineteen of the posts (Posts 1 through 18 and Post 23) appeared on Flores-Demarchi's personal Facebook account, while four (Posts 19 through 22) appeared on a Facebook account entitled "Voters Against Sexual Assault."[3]

Doe filed a supplement to his motion to dismiss arguing that, though appellees abandoned their claims against him, his request for fees and sanctions under the TCPA remained pending. Flores-Demarchi filed an amended motion to dismiss individually addressing each of the statements enumerated in appellees' second amended petition. Appellees filed a joint response to both motions to dismiss, including affidavits in which appellees denied each of the accusations which were made or alluded to in the listed

---

[3] Printouts of the Facebook posts were attached as exhibits to Flores-Demarchi's deposition transcript, which was included with appellees' response to the motions to dismiss. In footnotes throughout this memorandum opinion, we reproduce the posts as they were excerpted and numbered in appellees' response, retaining all spelling and grammatical irregularities and using appellees' descriptions of emojis, but providing our own descriptions of images.

Facebook posts. Flores-Demarchi and Doe each filed a reply to appellees' response.[4]

The trial court heard arguments on the motions to dismiss on July 8 and August 19, 2021, but did not rule on the motions. Accordingly, the motions were denied by operation of law thirty days after the hearing. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.005(a), 27.008(a). These accelerated appeals followed. *See id.* § 51.014(a)(12).

## II.     APPLICABLE LAW AND STANDARD OF REVIEW

### A.     TCPA

The TCPA "protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern." *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding). A party seeking dismissal under the TCPA has the initial burden to show that "the legal action is based on or is in response to . . . the party's exercise of: (A) the right of free speech; (B) the right to petition; or (C) the right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1). If the movant meets its initial burden, then the plaintiff must establish by "clear and specific evidence a prima facie case for each essential element of the claim in question" to avoid dismissal. *Id.* § 27.005(c). Even if the plaintiff makes this showing, the trial court must nevertheless dismiss the action "if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." *Id.* § 27.005(d).

Our review of a ruling on a TCPA motion to dismiss is de novo. *Entravision Commc'ns Corp. v. Salinas*, 487 S.W.3d 276, 281 (Tex. App.—Corpus Christi–Edinburg 2016, pet. denied); *Hicks v. Grp. & Pension Adm'rs, Inc.*, 473 S.W.3d 518, 526 (Tex.

---

[4] Flores-Demarchi attached evidence to his reply, including several of the same "Red's Voice" Facebook posts that were included in appellees' response. Appellees objected to the evidence as untimely and irrelevant, but no ruling on the objection appears in the record. We assume but do not decide that the evidence was properly before the trial court, and we consider it in our analysis herein.

5

App.—Corpus Christi–Edinburg 2015, no pet.).

## B.      Defamation

A statement is defamatory if "tends to . . . injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (defining libel as "defamation expressed in written or other graphic form"); *see Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623–24 (Tex. 2018). The elements of a defamation cause of action are "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *In re Lipsky*, 460 S.W.3d at 593.

A statement does not give rise to liability if it is either "not verifiable as false" or if "the 'entire context in which it was made' discloses that it is merely an opinion masquerading as a fact." *Tatum*, 554 S.W.3d at 624 (quoting *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002)); *see In re Lubbock*, 624 S.W.3d 506, 515 (Tex. 2021) (orig. proceeding) ("[T]rue statements cannot form the basis of a defamation complaint."). The "requisite degree of fault" depends on whether the person allegedly defamed is a private individual or a public figure. *In re Lipsky*, 460 S.W.3d at 593. Where the plaintiff is a public figure—as is the case with both appellees here—it must be shown that the defendant's statements were made with "actual malice." *Id.* "'Actual malice' in this context means that the statement was made with knowledge of its falsity or with reckless disregard for its truth." *Id.*

Texas common law distinguishes defamation claims as either per se or per quod. *Id.* at 596. Examples of defamation per se include "[a]ccusing someone of a crime" and

6

adversely remarking on an individual's "fitness to conduct his or her business." *Id.* Whether a statement is defamatory per se is generally a question of law. *Id.* "When defamation is per se, the communication is actionable in and of itself without proof of actual damages." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 418 (Tex. 2020).[5]

### III.   FLORES-DEMARCHI

### A.   Prima Facie Case

There is no dispute that appellees' claims are "based on" or "in response to" Flores-Demarchi's exercise of the right of free speech; thus, the burden was on appellees to produce "clear and specific evidence" to establish a "prima facie case for each essential element" of their claims. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). Flores-Demarchi contends by his first issue that appellees failed to meet this burden. In particular, he disputes that appellees showed: (1) that the statements at issue had a defamatory

---

[5] In *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 626 (Tex. 2018), the Texas Supreme Court sought to clarify the terminology used for different types of defamation claims. The court noted that the terms "defamation per se" and "defamation per quod" have historically been used by Texas courts to describe two related but distinct concepts. *Id.* First, under the common law, "defamation per se" meant a "statement that is defamatory in and of itself," whereas "defamation per quod" meant "a statement whose defamatory meaning required reference to extrinsic facts." *Id.* at 625. Second, the term "defamation per se" has also been used to describe statements that are "so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish"; in that context, "defamation per quod" is simply "defamation that is not actionable per se" and requires proof of special damages. *Id.* at 626 (citing *In re Lipsky*, 460 S.W.3d 579, 596 (Tex. 2015); *Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013)). The *Tatum* court stated that, for clarity, the terms "per se" and "per quod" should be used only in the second context—that is, "in relation to special damages." *Id.* As to the first context, the preferred terms are "textual defamation" and "extrinsic defamation." *Id.* ("'[T]extual defamation' refers to the common-law concept of defamation per se, that is, defamation that arises from the statement's text without reference to any extrinsic evidence. On the other hand, 'extrinsic defamation' refers to the common-law concept of defamation per quod, which is to say, defamation that does require reference to extrinsic circumstances."); *see id.* ("[P]laintiffs relying on extrinsic defamation must assert as much in their petitions to present the theory at trial."). The court further observed that "textual defamation" may be explicit (when "the defamatory statement's literal text and its communicative content align") or implicit ("when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way"). *Id.* at 627 (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 113 (Tex. 2000)).

meaning; (2) that the statements were actionable statements of fact as opposed to unactionable opinions; (3) that Flores-Demarchi acted with actual malice; or (4) that appellees suffered damages.

A "prima facie case," as used in the TCPA, means "evidence that is legally sufficient to establish a claim as factually true if it is not countered." *S & S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018). It represents the "minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true." *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 688 (Tex. 2013). In the context of the TCPA, "clear" has been interpreted to mean "unambiguous," "sure," or "free from doubt," while "specific" has been interpreted to mean "explicit" or "relating to a particular named thing." *In re Lipsky*, 460 S.W.3d at 590.

### 1. Deposition Testimony

In deposition testimony attached to appellees' response to the motions to dismiss, Flores-Demarchi stated that he graduated from Sharyland High School in 2017. He acknowledged that he made all of the posts which appear on his personal Facebook account, but he stated that he does not know who operates the "Voters Against Sexual Assault" Facebook account, and he denied re-posting any material from that account.

With respect to Facebook Post 1,[6] Flores-Demarchi stated he re-posted a comment by Roma Lizcano alleging that Sharyland ISD "housed and covered up . . . crimes committed by a pervert" because Lizcano was his friend and "[he] tend[s] to trust [his] friends." He stated that Lizcano's allegation "didn't seem outside of the scope

---

[6] Post 1 stated: "Sharyland [ISD] is complicit in sexual assault." It included a re-post from Roma Lizcano's Facebook account stating: "Sharyland ISD housed and covered up the unlawful crimes committed by a pervert posing as a CHILD PSYCHOLOGIST for DECADES."

8

of possibility" given "everything that was going on," such as "all the outcries that were going on about sexual assault at the school at the time." When asked whether he had any specific evidence to support Lizcano's allegation, Flores-Demarchi replied:

> I have heard of different—I've heard other stories about [the school psychologist], but, no, nothing that—like, I didn't have physical damning proof, but in terms of, like, heart-wise, seeing all of these people that are very much listening to survivors, I very much did the same thing. It's part of like my generation's culture, trusting survivors, and when there's an uproar like this, it's just empathetically I tend to trust the person that has no gain out of it—nothing to gain out of it.

He stated he "personally ha[s] no physical documentation" to support any of the allegations made in any of the Facebook posts.

As to his statement in Post 2[7] that Sharyland ISD "will bulldoze over sexual assault survivors in order to build their fantasy cash cow," Flores-Demarchi explained that he was referring to the fact that a school's government funding is "based on how well the school performs." Regarding the allegations of corruption in Posts 2 and 3,[8] Flores-Demarchi was asked whether he was aware that "corruption" is commonly defined as "dishonesty or fraudulent conduct by those in power." He replied: "Yeah, but, I mean, I think it's political hyperbole. I think a lot of people get accused of corruption in a political sense. It's more of the idea that they are not doing what the people voted in them for them to do." He agreed that he was not aware of any dictionary which defined "corruption" in this manner.[9]

---

[7] Post 2 stated:

There are a lot of families scared and distraught for the safety of their kids and many community members disgusted at the lengths administrators and school board members will go to cover up their true disappointing image. They will bulldoze over sexual assault survivors in order to build their fantasy cash cow. NO MORE CORRUPTION!!

[8] Post 3 stated "long-standing incumbents have been corrupted and need to be replaced!!"

[9] Flores-Demarchi also said he was referring to the school board in general and "wasn't completely aware" that Smith or Garcia were members of the board at the time of the posts.

Flores-Demarchi explained that he re-posted the allegations from "Red's Voice" in Post 4[10] because they "seemed plausible," and he noted that there was an article attached to a previous post stating that an audit had been conducted on Sharyland ISD and that Jesse Muniz, a school district financial advisor, admitted in a deposition "to putting works not out for bid." Flores-Demarchi stated he "had reason to believe at that point that there could be a possibility of crime" because of "[t]he way they conducted themselves politically." He later said: "It's not so much hard evidence that I had but overall community—community feelings and understanding of the situation." He agreed that it would not be proper to accuse someone of a crime based only on "community feelings," but he stated:

> I think . . . it's like minimizing it by saying it's feelings, just stories, their personal experiences, and when you listen to them, I think it's important to start that conversation.
>
> So for—so, for example, Donald Trump having his hotel and having foreign people stay at his hotel, and—like, foreign, like, world powers, I think it's healthy to start raising questions about it. And in that case, I would even go as far as to politically hyperbolize that he is engaging in these, like, relationships.
>
> That's not saying that I completely believe it, and I'm not saying that he should be convicted for jail. I'm trying to hyperbolize the problem in order to start the conversation.

---

[10] Post 4 stated "HMMMM pls read!!!!" and included the following re-post from "Red's Voice":

IMPROPER INFLUENCE, ABUSE OF POWER, BRIBES and OTHER POTENTIAL CRIMES, sure sounds like #twiceindicted KENNY is facing a very serious FBI investigation.

Wonder if REVIEWING and DENYING public information requests for a FINANCIAL AUDIT submitted to #EXIT138 would constitute said crimes?

. . . .

As of now said AUDIT has NEVER PUBLICLY seen the light of day and its refusal to be released is ILLEGAL!!!!!!

Happy Hunting FEDS

As to Post 5,[11] Flores-Demarchi could not recall where he heard the allegation regarding "corruption at Sharyland ISD through construction contracts"; however, he said he "remember[s] it being public and pretty credible."

According to Flores-Demarchi, Post 6[12] referred to an incident in which John H. Shary Elementary School parents were sent text messages encouraging them to vote yes on a bond proposal which would have benefitted the school, but less than an hour later, another message was sent to the parents advising them to "disregard" the earlier "illegal" message.[13] He said: "I saw the screen shots, and they seemed credible enough, and everything was cited well enough that I thought it was pretty factually based, so I reposted it."

Flores-Demarchi acknowledged that "Waldo," as used by "Red's Voice" in several posts, refers to Smith. He denied knowing that Smith had moved to Boerne—he explained that the references in the original "Red's Voice" post to Boerne and Fredericksburg "went over my head." He could not remember whether he knew of any evidence to support the allegations made in the original "Red's Voice" Posts 7 and 8, which he re-posted.[14] With

---

[11] Post 5 stated:

WOAH corruption at Sharyland ISD through construction contracts??? jk I am not surprised because most corruption in the valley is from school districts misappropriating tax payer money to hook their compadres up with sweet deal construction contracts that rake in huge profits for themselves and at the expense of the tax payer. Of course its all very political but it gets a little overboard when Sharyland is publicly and credibly accused of funneling money to certain construction companies THAT WEREN'T DOING THE WORK THEY WERE BEING PAID FOR.

[12] Post 6 stated "When youre so comfortable committing fraud that you don't even realize you're doing it anymore. OOPS." It included the following re-post from "Red's Voice": "JOHN H. SHARY ELEMENTARY PARENTS WERE GIFTED AN ILLEGALITY . . . ELECTIONEERING ILLEGALITY TO BE PRECISE!!!!. . . .#whatisWALDOtoyou . . . BUT its not the first time #ElectioneeringViolations occur . . . OH NO. . . .#VoteThemOut #REIGNOVER #EXIT138."

[13] The original "Red's Voice" post stated that, "[a]ccording to election code, school district resources cannot be used to campaign [for] any candidate, measure or political party."

[14] Post 7, a re-post from "Red's Voice," stated:

11

respect to the "electioneering violations" referred to in Post 9,[15] Flores-Demarchi stated:

> I don't remember if I had any evidence other than that portrayed, and I believe I didn't, other than those presented by Red's Voice in the drop down of every single one of the posts in terms of the citations and what—where they were getting the information from. To me, everything looked properly cited and more credible than a lot of like other posts that get shared. So, yeah, I read through it, and I had reason to believe it was factual because of the citations. If not factual, at least politically valuable.

As to Post 10, Flores-Demarchi conceded that he knew that accusing someone of

violating the RICO Act is equivalent to accusing them of a crime.[16] When asked why he

---

Let take a stroll down #memorylane to visit PAST ELECTIONEERING VIOLATIONS.....

So back in 2015 when #whereswaldo was running for #EXIT138, she had the brightest idea to email an invite of her campaign to school personnel emails. #TECHGURU Culberson rather quick on the lookout for HER, emailed employees stating #waldo had done it in ERROR AND WAS APOLOGETIC FOR HER CRIME.

. . . .

Someone quick #ALERT BOERNE AND FREDERICKSBURG SCHOOL DISTRICTS BEFORE #WALDO #Slithers and INFILTRATES

Post 8, also a re-post from "Red's Voice," stated:

BAD EDUCATION stars Hugh Jackman as FRANK TASSONE and Allison Janney as PAM GLUCKIN in a based on a TRUE STORY about New Jersey's ROSLYN Union Free School District, which was embroiled in a SCANDALOUS FINANCIAL EMBEZZLEMENT FOR YEARS.

Say WHAT

Turns out the school district was FULL OF NARCISSTIC, SELF-SERVING, MORALLY CORRUPT, DOUBLE LIFE LIVING, SO CALL PROFESSIONALS, who funneled TAX MONEY thru expense-account paddin, vendor-bidding violations #DejaVu, check-record fabrications, even the creation of phony businesses.

On New York Magazine, Judy Winters, a COMMUNITY ACTIVIST, described TASSONE as Mr. Pecksniff, a character from Charles Dickens who exploited weaknesses of others, selfish and corrupt behind a display of BENEVOLENCE.

***Reminds me of MANY LOCAL PECKSNIFFS!!!!!!

. . . .

GEEZ THAT MOVIE HITS HOME #EXIT138!!!!!!!

Interesting side note, the ONLY CONSTANTS AT #SHARYLANDISD ARE THE BOARD MEMBERS, HMMMMMM

[15] Post 9, a re-post from "Red's Voice," stated in part: "Since #Waldo was here #flirting with #ELECTIONEERING VIOLATIONS . . . ."

[16] Post 10, a re-post from "Red's Voice," stated:

Well this looks like a job for me, So everybody just follow me, Cause we NEED A LITTLE

re-posted this allegation from "Red's Voice," he replied: "I thought I was sharing a perspective it was a possibility, and I, again, was trying to invoke reflection and maybe discourse." When asked whether it was "fair" to compare Sharyland ISD to the mafia, he said: "I think, politically, yes, it's fair."

Flores-Demarchi agreed that "Stuart," as mentioned the Facebook posts, refers to Garcia.[17] He agreed that he had no knowledge, at the time he re-posted the allegations in Post 11,[18] that Garcia was "using a politiquera in his campaign for reelection." As to

---

CONTROVERSY, Cause it feels so empty without me

. . . .

First who the F$!# is WE?

WE is a pronoun referencing at least two if not more people, such as a group. Know what else is considered a group an 'enterprise'.

Where else have I heard about enterprises????

Oh that's right RICO!!!!!! You know the Racketeer Influenced and Corrupt Organizations Act.

. . . .

So pictured is an informal flow chart based on MY OPINION as to the hierarchy at #SharylandISD and given the fact THAT CERTAIN ACCOUNTS ARE NOW IDENTIFYING THEMSELVES AS #LOYALISTS lets put them in order.

Huh, look at that, it resembles another chart

The post included a chart purportedly depicting the Sharyland ISD administration hierarchy as well as a chart depicting the hierarchy of "New York's Five Families." The post continued:

According to the Dallas Morning News, in an article published on 12/9/16, a retired FBI agent Don Sutherland Jr. contacted David Lieber to explain how his forensic accounting investigation in Texas School Districts found four school districts with numerous programs which were fraudulent, boards were incompetent, Superintendents were corrupt and are there to build resumes. He also gave examples of public school districts types of corruption.

[17] Flores-Demarchi also agreed that "paper shredder," as used in Post 13, refers to the member who replaced Smith on the Sharyland ISD board.

[18] Post 11, a re-post from "Red's Voice," stated: [Re-post from "Red's Voice":]

But you know what is [shit], is the [rat snake] #Stuart starting HIS RE ELECTION CAMPAIGN ON HIS PAGE & ALL [STAR] #POLITIQUERA want to use A RECOMMENDED TASB RESOLUTION AS HIS OWN BENEVOLENT ACT.

In true con artist, SELF-SERVING, AFTER HE HIMSELF IN DECEMBER BD MEETING REFERRED TO MY OPINION AS MISINFORMED, [shit] #loyalist #POLITIQUERA (who else pays you?) TAGGED HERSELF WITH #STUARTS WIFEY, then MESSAGED ME A SS TO TRY TO SWAY MY OPINION OF HIS #Pecksniff [ass] NOT REALIZING I DO SEE

the political cartoon depicted in Post 12,[19] Flores-Demarchi stated: "[M]y understanding of the gist of this is that school board members were more looking out for what benefits them as opposed to what benefits the institution and the community." Regarding Post 13[20]—as with the other re-posts from "Red's Voice"—Flores-Demarchi denied that he intended to "adopt" or endorse the allegations stated therein; instead, he said he was merely "sharing" the posts in order to "start a conversation" or "discourse." He acknowledged that he did not post anything on Facebook disavowing "Red's Voice" or disclaiming his belief in the allegations made on that account. He said: "But I'm a student. If I was a professional, I think I would do that, but considering I'm still a student, I would think that I would have my free speech not dictated by any private entity that would constitute me having to do that."

Concerning Posts 15, 16, and 17,[21] Flores-Demarchi conceded that "Marie

---

THRU THE [bullshit].

. . . .

I guess [food] from [shit] #loyalist #vendor and #leface "breaking" laws by distributing jean passes like money for #strippers makes up for it. What other crimes have you committed??? #HENCHMEN

. . . .

#Reignover [rat snake] #stuart

[19] Post 12, a re-post from "Red's Voice," stated: "LET THE #shipwreck COMMENCE #ssratsnake #SharylandISD" and included a cartoon depicting a sinking ship labeled "S.S. Rat Snakes" while rats labeled "Vendors," "Loyalists," and "Cutter" abandon ship carrying treasure chests.

[20] Post 13, a re-post from "Red's Voice," stated: "#WALDO is NO longer sitting her [ass] on the #BOARD #youcantsitwithus BUT IS PURSUING TO INSTALL HER #LAPDOG [rat snake] #papershredder IN HER PLACE, ALONG SIDE [rat snake] #Stuart. . . . Does #SharylandISD COMMUNITY need ANYMORE [rat snake] CRONIES #papershredder #cookiecutter??????"

Post 14, a re-post from "Red's Voice," stated: "The [shit] show is soooooooo GOOD, I've run out of [popcorn]!!!!!!!!!!!!!!!! . . .#WhosNext [rat snake] #stuart" and included a meme stating "ME SITTING BACK . . . WATCHING THE TWO-FACED F*CKERY."

[21] Post 15, a re-post from "Red's Voice," stated: "COMPLACENCY IS THE ONLY F@$%ING OPTION!!!!!!! [rat snake] #marieantoniette." It included a photo of Smith superimposed over Marie Antoinette saying "LET #Exit138 EAT CAKE" alongside a cake labeled "$35 million school bond."

Post 16, a re-post from "Red's Voice," stated: "No other than [rat snake] #marieantoinettes Ford of

Antoinette" was intended to refer to Smith. He denied that he was "trying to convey that something immoral, corrupt or illegal was happening when Ford of Boerne sold three trucks to Sharyland ISD."[22] When asked whether he was aware that Smith's dealership "lost money" on the transaction with Ford of Boerne, Flores-Demarchi stated: "I don't think so, nor did I care."[23] He agreed that he believed Smith was "benefiting" from the district's

Boerne was awarded a bid, 123K [bag of money], #cuttingchecks for 3 TRUCKS."

Post 17 stated: "[C]an't believe that Melissa Smith (board member) is financially benefitting from the schools business practices!!! oh wait yes i can"

[22] The parties agree that Smith is a co-owner of Ford of Boerne.

[23] This testimony was elicited during the following colloquy:

Q. [Appellees' counsel]  Did you know that they lost money on this transaction?

. . . .

A. [Flores-Demarchi]  I don't think so, nor did I care.

Q.  Well—but when—if you're going to say that someone financially benefited, in your book, in your definition, is losing money a financial benefit?

A.  I think any traffic of business is a benefit.

Q.  Even if you lose?

A.  I mean, from my understanding at that point, I had no idea they had lost.

Q.  I know, but did you bother to find out before you accused her of financially benefiting?

. . . .

A.  I care to cover all the bases. I mean, it doesn't make sense to sell for profit, so I don't see why anyone—I mean, sell for loss, or not getting profit on any sale, so capitalistically speaking, I don't see how that could make any other sense other than financial benefit. So in a—as anyone of sound mind would understand it, she had financially benefited.

Q.  So you are assuming that she had a financial benefit without having any knowledge—any personal knowledge whatsoever, correct?

. . . .

A.  I'm assuming, based on how—based on the fact that other people submitted bids that were lower and that gave trucks, it would be ridiculous for me to think that anything else was done from a sale other than profit.

15

business practices, but he did not know whether that was illegal. He agreed that an elected official "financially benefiting from the institution that the elected official is serving" would be considered corruption. He denied having seen the film *Joker* or knowing what it was about, and he denied that Post 23[24] could be viewed as a threat.

### 2. Actual Malice

Because it is dispositive, we first address whether appellees produced clear and specific evidence of actual malice. Appellate judges have a constitutional duty to "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity" in defamation suits brought by public officials. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 514 (1984); *Clark v. Jenkins*, 248 S.W.3d 418, 435 (Tex. App.—Amarillo 2008, pet. denied); *see Salinas v. Townsend*, 365 S.W.3d 368, 383 (Tex. App.—Corpus Christi–Edinburg 2011), *rev'd on other grounds sub nom. Salinas v. Salinas*, 365 S.W.3d 318 (Tex. 2012). The actual malice element is "relatively demanding" and "honors our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks' on public figures.'" *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 171 (Tex. 2003) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

As noted, to establish actual malice, a defamation plaintiff "must prove that the defendant made the statement with knowledge that it was false or with reckless disregard of whether it was true or not." *Scripps NP Operating, LLC v. Carter*, 567 S.W.3d 1, 22

---

[24] Post 23, a re-post from "Red's Voice," contained an image depicting characters Murray Franklin and Arthur Fleck from the film *Joker* (Warner Bros. 2019), in which Franklin says: "Let me get this straight you think being a stakeholder with a VOICE in Sharyland ISD is funny???" and Fleck replies: "I do. And I'm tired of pretending its NOT." Appellees noted that, in the film, Fleck later shoots and kills Franklin.

(Tex. App.—Corpus Christi–Edinburg 2016), *aff'd*, 573 S.W.3d 781 (Tex. 2019)

> Reckless disregard . . . is a subjective standard that focus[es] on the conduct and state of mind of the defendant. It requires more than a departure from reasonably prudent conduct. Mere negligence is not enough. There must be evidence that the defendant in fact entertained serious doubts as to the truth of his publication, [or] evidence that the defendant actually had a high degree of awareness of . . . [the] probable falsity of his statements. Thus, for example, the failure to investigate the facts before speaking as a reasonably prudent person would do is not, standing alone, evidence of a reckless disregard for the truth, but evidence that a failure to investigate was contrary to a speaker's usual practice and motivated by a desire to avoid the truth may demonstrate the reckless disregard required for actual malice.

*Bentley*, 94 S.W.3d at 591 (quotations and footnotes omitted). Actual malice does not include "ill-will, spite, or evil motive." *Huckabee v. Time Warner Ent. Co.*, 19 S.W.3d 413, 420 (Tex. 2000). It "concerns the defendant's attitude toward the truth, not toward the plaintiff." *Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005).

An actual malice determination "focuses not on what the defendant should have done or did not do." *Tex. Campaign for the Env't v. Partners Dewatering Int'l, LLC*, 485 S.W.3d 184, 201 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.). Neither does the determination focus on what a defendant would have known had he researched the matter prior to publication. *Bentley*, 94 S.W.3d at 596 ("A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is."). Instead, the focus is on the defendant's state of mind at the time of the publication and whether there is clear and specific evidence that he either knew the statements were false or harbored serious doubts as to their truth. *Id.* at 591.[25]

First, we note that there is no evidence to support appellees' allegations that

---

[25] "[I]nherently improbable assertions and statements made on information that is obviously dubious" may also show actual malice. *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 638 (Tex. 2005). The parties appear to agree that actual malice was not shown in this manner in this case.

Flores-Demarchi published Posts 19 through 22.[26] The record does not indicate who authored these posts, which appeared only on the "Voters Against Sexual Assault" Facebook account. In any event, in their response to the motions to dismiss, appellees conceded that these posts were "included in [their live petition] only to provide context" and that "the actionable defamatory statements are limited to [Posts] 1 through 18." Accordingly, we limit our review to Posts 1 through 18, all of which appeared on Flores-Demarchi's personal Facebook account.

Seven of these posts (Posts 1–6 and 17) contain statements originally made by Flores-Demarchi; the remainder are entirely re-posted from "Red's Voice." In his deposition, Flores-Demarchi denied that he intended to adopt or endorse the allegations made in the "Red's Voice" re-posts, and he asserts on appeal that, because appellees' claim is for "defamation by implication," they must produce evidence that he "endorsed or intended" the defamatory meaning of the statements at issue, including those originally posted by "Red's Voice." We disagree. In *Tatum*, the Texas Supreme Court held that "a plaintiff who seeks to recover based on a defamatory implication—whether a gist or a discrete implication—must point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the defamatory inference.'" *Tatum*, 554 S.W.3d at 635. But here, the alleged defamatory meaning of the publications at issue

---

[26] Post 19 stated: "Shame on you Mellisa [sic]!" It included a photo of Smith with red "X" over her face and the text "Mellisa [sic] is a supporter of SEXUAL ASSAULT."

Post 20 contained a photo of Garcia with red "X" over his face.

Post 21 stated: "GREAT NEWS! Board member Mellisa [sic] won't be seeking a second term, so now our focus is only on one SEXUAL ASSAULT supporter Pepe Garcia. NASTY PEPE, you shouldn't run either. we will never forgive your complicity and cowardness!!!"

Post 22 contained a photo of Garcia with red "X" over his face and the text: "Pepe Garcia is in favor of SEXUAL ASSAULT."

18

is not implicit. Rather, the literal text of the posts aligns with their communicative content—i.e., that appellees are corrupt and complicit in sexual assault. *See id.* at 627.[27] Accordingly, under the terminology of *Tatum*, appellees' claims are for explicit "textual defamation" and do not require "additional, affirmative evidence within the publication" suggesting the publisher "intend[ed] or endorse[d]" the defamatory meaning. Thus, we consider each post Flores-Demarchi published, regardless of whether he was the original author. *See Milo v. Martin*, 311 S.W.3d 210, 214 (Tex. App.—Beaumont 2010, no pet.) ("Under Texas law, a person who repeats a defamatory statement made initially by another can be held responsible for republishing the libelous statement.").

On the issue of actual malice, in their response to the motions to dismiss, appellees pointed to Flores-Demarchi's deposition testimony that he intended to "call attention" to appellees' alleged malfeasance, to convey that Smith was "corrupt," and to "criticize by hyperbolizing sort of what was happening at Sharyland." Appellees note that Flores-Demarchi repeatedly testified that he had no "physical documentation" or other evidence to support the allegations. Instead, Flores-Demarchi stated that he "had formed [his] own opinions from personal encounters with [the school board] and how they handled other

---

[27] The posts at issue allege, among other things, that Smith financially benefitted from her position as a Sharyland ISD board member; that is, they allege that she committed a crime. *See* TEX. PENAL CODE ANN. § 39.02(a) ("A public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly: (1) violates a law relating to the public servant's office or employment; or (2) misuses government property, services, personnel, or any other thing of value belonging to the government that has come into the public servant's custody or possession by virtue of the public servant's office or employment."). For purposes of a defamation analysis, "a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness for office." *Greer v. Abraham*, 489 S.W.3d 440, 447 (Tex. 2016); *see In re Lipsky*, 460 S.W.3d at 596 (noting that "[a]ccusing someone of a crime" is an example of defamation per se).

In any event, we assume but do not decide that the posts were false statements of verifiable fact and were reasonably capable of a defamatory meaning. *See Tatum*, 554 S.W.3d at 624; *Hancock*, 400 S.W.3d at 66 ("If the statement is not reasonably capable of a defamatory meaning, the statement is not defamatory as a matter of law and the claim fails.").

things with [his] family." This evidence indicates that Flores-Demarchi intended to damage appellees' professional and political reputations, and that he did so without independently investigating the allegations originally put forth by "Red's Voice." However, it does not show that he subjectively harbored any doubts about the truth of the allegations or that his failure to investigate was motivated by a desire to avoid the truth. *See Bentley*, 94 S.W.3d at 591. To the contrary, Flores-Demarchi repeatedly stated in his deposition that he believed the allegations were "credible" and "properly cited."

Appellees additionally point to Flores-Demarchi's testimony, concerning Sharyland ISD's transaction with Ford of Boerne as referenced in Posts 16 and 17, that he did not know "nor did [he] care" that "they" actually "lost money" on the transaction. Flores-Demarchi made this remark after he was asked whether he knew that the dealership "lost money" on the transaction with the school district. However, as Flores-Demarchi attempted to explain in his deposition, the dealership "los[ing] money" on that specific transaction would not necessarily be inconsistent with his broader claim, which is that Smith benefitted financially from the school district's business practices. Moreover, Flores-Demarchi later stated that, "from [his] understanding," he "had no idea they had lost" money. Thus, his testimony that he "did [not] care" is not "clear and specific" evidence of a reckless disregard for the truth at the time he made the statement. Flores-Demarchi's testimony simply does not meet the "relatively demanding" standard for actual malice, which is imposed on all public-figure defamation plaintiffs in order to advance our "profound national commitment" to uninhibited and robust debate on issues of interest to the public. *See Forbes*, 124 S.W.3d at 171.

It is apparent from Flores-Demarchi's testimony that he did not meaningfully

investigate the claims made by "Red's Voice." Citing *Bentley*, appellees argue that this failure to investigate is probative as to actual malice because it was "contrary to [his] usual practice." *See Bentley*, 94 S.W.3d at 591. To support this, appellees note that Flores-Demarchi described himself as an "aspiring educator" and stated that he believed "you should always question your beliefs. And if something seems wrong, [you should] question it even more until you questioned it so much that you know it's pretty grounded in something." While this testimony may demonstrate that Flores-Demarchi's failure to investigate fell short of his own *ideals*, it does not show that such failure was contrary to his own usual *practice*. *See id.* Nor does it establish that Flores-Demarchi was "motivated by a desire to avoid the truth," as required by *Bentley*. *See id.*

Finally, appellees argue that Flores-Demarchi "testified that he is 'not saying that I completely believe' his own Facebook Posts." Appellees are referring to Flores-Demarchi's hypothetical statement concerning "Donald Trump . . . having foreign people stay at his hotel" and how Flores-Demarchi "would . . . politically hyperbolize that he is engaging in these . . . relationships." But Flores-Demarchi did not state or imply that he "[did not] completely believe" the allegations at issue in this case in particular. We cannot say that this constitutes "clear and specific" evidence that Flores-Demarchi "entertained serious doubts as to the truth" of the challenged posts or "actually had a high degree of awareness" of their probable falsity. *See id.*

We note that Flores-Demarchi also stated, with respect to the "electioneering violations" referred to in Post 9, that he "had reason to believe it was factual" and "[i]f not factual, at least politically valuable." This statement again demonstrates that Flores-Demarchi failed to investigate the allegations and that he was motivated at least in part

21

by a desire to harm appellees politically. But it does not tend to establish that he subjectively doubted the truth of the posts, or that he was motivated by a desire to avoid the truth.

For the foregoing reasons, we conclude that appellees did not meet their "relatively demanding" burden to develop and produce "clear and specific evidence" demonstrating with "convincing clarity" that Flores-Demarchi acted with actual malice. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b); *Bose Corp.*, 466 U.S. at 514; *Forbes Inc.*, 124 S.W.3d at 171. Flores-Demarchi's deposition testimony indicates that he was negligent with respect to confirming the veracity of the statements he posted and re-posted. Such behavior is irresponsible and morally dubious, and it may well result in reputational harm. But negligence is constitutionally insufficient to support a defamation action against a public figure. *See N.Y. Times Co.*, 376 U.S. at 283 (noting that "the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct"). Accordingly, the trial court erred by denying Flores-Demarchi's motion to dismiss. We sustain Flores-Demarchi's first issue, and we need not address his remaining issues. *See* TEX. R. APP. P. 47.1.

## IV. DOE

In his appeal, Doe argues that his motion to dismiss survived appellees' non-suit and the trial court erred by failing to (1) grant the motion, (2) award him attorney's fees, or (3) assess sanctions against appellees under the statute.

The relevant TCPA section states in part:

(a)   Except as provided by Subsection (c) [concerning the dismissal of compulsory counterclaims, not applicable here], if the court orders dismissal of a legal action under this chapter, the court:

(1)   shall award to the moving party court costs and reasonable

22

> attorney's fees incurred in defending against the legal action; and
>
> (2) may award to the moving party sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a). Although a plaintiff has an absolute right to nonsuit a claim before trial, a non-suit "shall not prejudice the right of an adverse party to be heard on a pending claim for affirmative relief." TEX. R. CIV. P. 162. Therefore, when a defendant files a motion to dismiss under the TCPA but is later non-suited, the motion survives the non-suit if it requests attorney's fees and/or sanctions. *Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 468 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd); *Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287, 293 (Tex. App.—Austin 2018, pet. denied); *Walker v. Hartman*, 516 S.W.3d 71, 80 (Tex. App.—Beaumont 2017, pet. denied). Here, Doe filed his TCPA motion to dismiss, including requests for fees and sanctions, ten minutes before appellees first filed their amended petition omitting Doe as a defendant. Accordingly, his motion was not extinguished by the non-suit. *See Gaskamp*, 596 S.W.3d at 468; *Craig*, 550 S.W.3d at 293; *Walker*, 516 S.W.3d at 80.

Moreover, we agree with Doe that the denial of his motion was erroneous. As with the claims against Flores-Demarchi, appellees do not dispute that their claims against Doe are "based on" or "in response to" Doe's exercise of the right of free speech, right to petition, or right of association. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1). Therefore, appellees had to produce "clear and specific evidence" of each essential element of their claim to survive Doe's TCPA motion. *Id.* § 27.005(c). They failed to do so. In particular, the only evidence adduced as to actual malice pertained to Flores-Demarchi. Even assuming the "Red's Voice" posts were false and defamatory, there was

23

no evidence indicating that Doe knew the allegations contained therein were false or that he actually harbored serious doubts about their truth. *See Bentley*, 94 S.W.3d at 591. Accordingly, the trial court was required to dismiss the claims against Doe. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). The court also: (1) must award to Doe "court costs and reasonable attorney's fees incurred in defending against" appellees' suit; and (2) may award to Doe sanctions against appellees "as the court determines sufficient to deter [appellees] from bringing similar actions described in [the TCPA]." *Id.* § 27.009(a).

On appeal, though appellees generally ask us to affirm the trial court's judgment with respect to Doe, they do not appear to dispute Doe's motion to dismiss should have been granted.[28] Instead, appellees argue that the trial court was within its discretion to "award[] zero attorney's fees" and to decline to award sanctions. Appellees note that Doe "was never served" with the lawsuit and did not file an answer prior to filing his TCPA motion to dismiss. They argue that "[t]he trial court could have concluded that, in these unique circumstances, Doe did not reasonably incur attorney's fees in 'defending against' a legal action." *See id.* § 27.009(a)(1).

We disagree. In this case, the motions to dismiss were denied by operation of law because the trial court did not rule on the motions within thirty days of the hearing. *See id.* § 27.008(a). Because the motions to dismiss were never granted, the court was never called upon to rule on either appellant's request for attorney's fees or sanctions. *See id.* § 27.009(a). Under these circumstances, a remand is necessary for the trial court to

---

[28] Appellees argue that "Doe confuses the threshold question—whether he is theoretically entitled to an award of attorney's fees in the first place—with the actual question that the trial court faced: i.e., the proper amount of attorney's fees." But the court did not face that question because it did not grant Doe's motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a) (requiring a court to award attorney's fees to the moving party, and allowing the court to award sanctions, only "if the court orders dismissal of a legal action under this chapter").

determine, in the first instance, the proper amount of attorney's fees and whether to award sanctions, with respect to both appellants. *See* TEX. R. APP. P. 43.3(a). We sustain Doe's issue on appeal.

## V. CONCLUSION

In both appeals, we reverse the trial court's judgment and remand for consideration of attorney's fees and sanctions under TCPA § 27.009.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
30th day of June, 2022.